UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) Case No. 3:23-cr-00109-VMK
)
MACKENZIE SPURLOCK, et al., )
)
)
Defendant. )
______________________________ )

TRANSCRIPT OF IMPOSITION OF SENTENCE
**BEFORE THE HONORABLE VIGINIA M. KENDALL, DISTRICT JUDGE**
Wednesday - December 3, 2025
10:30 a.m. - 11:25 a.m.
Anchorage, Alaska

**FOR THE GOVERNMENT:**
Office of the United States Attorney
BY: KARLA G. PERRIN
1200 Sixth Avenue, Suite 900 OCR-158
Seattle, Washington 98101
206-553-1762

**FOR THE DEFENDANT:**
Ingaldson Fitzgerald, P.C.
BY: KEVIN T. FITZGERALD
813 W 3rd Avenue
Anchorage, Alaska 99501
907-258-8751

Probation Officer: Paula Rydberg
Clerk in attendance: Suzannette David

**STACY M. BALDWIN**
**Realtime Certified Reporter**
**Federal Official Court Reporter**
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Stenographic Record

(Call to order of the Court at 10:30 a.m.)

DEPUTY CLERK: Good morning, Your Honor. The United States District Court for the District of Alaska is now in session. The Honorable Chief Judge Virginia M. Kendall presiding.

Your Honor, we're on record in Case No. 3:23-cr-00109, *United States of America versus Mackenzie Spurlock and Matanuska Diesel, LLC*.

Counsel, please state your appearance for the record.

MS. PERRIN: Good morning, Your Honor. Karla Perrin on behalf of the government.

THE COURT: Good morning.

MR. FITZGERALD: Good morning, Judge. Kevin Fitzgerald on behalf of Mr. Spurlock and the business.

THE COURT: Okay. Good morning.

Good morning, Mr. Spurlock.

THE DEFENDANT: Good morning.

THE COURT: And, good morning, everyone else.

Well, we are here for sentencing this morning. And the way that this works, Mr. Spurlock, is that under the sentencing procedure I need to look at a sentencing guideline calculation first. I take that into account before I look at the sentencing statute. And then the statute requires that I look at the seriousness of the

offense, history and characteristics of you, the need to prevent you from committing another crime, that's what we call specific deterrence; the need to prevent others from committing a similar crime, we call that general deterrence; the need to avoid any unwarranted sentencing disparities, taking take into account any personal, medical, or health issues; and then finally, just to impose a sentence that is sufficient but not unnecessary.

So with that in mind, let me just review what I have in front of me. I have the two pre-sentence investigation reports.

And, for the record, it's Ms. Rydberg, again, correct?

PROBATION OFFICER: Yes, Your Honor.

THE COURT: Yes. Good morning. Thank you for these reports.

I also have the government's sentencing memorandum, and the -- for both. And I have the defendant's sentencing memorandum, and I have the addendum. I have two sentencing recommendations. And, of course, the final report and recommendation upon pleas of guilty for the entity and the defendant.

Is that the world view for me?

MS. PERRIN: Yes, Your Honor.

MR. FITZGERALD: Yes, Judge.

THE COURT: Okay. Very well.

Then let's begin by me first accepting the final report and recommendation on the plea of guilty for Mr. Spurlock and for the Matanuska Diesel. And I will do so now, and those will be entered.

And now we will turn, as we should, to the pre-sentence investigation report. And I think the appropriate one to start with would be the defendant, Mr. Spurlock. And the guideline calculations for you begin -- let's see if we can find them. Here we go.

On page 7 -- really on page 6, but the base offense level for the guideline is an eight, according to the probation officer. It's increased by six levels because if the offense resulted in any continuous or repetitive discharge, remission of a hazard or toxic substance into the environment, it should be increased six levels. And then two levels more for using -- abusing a position of public or private trust, and using a special skill to do so. The probation officer has come up with a level 16, with three off for acceptance. Meaning a total offense level of 11. And then the criminal history for Mr. Spurlock is I. So the guideline provision is, according to the probation officer, 8 to 14 months.

So, first, do you have any objection to those guideline calculations?

MR. FITZGERALD: Judge, I did. I have an objection. May I remain seated?

THE COURT: You can do either one, whichever is better for you.

MR. FITZGERALD: Okay. I have an objection to the special skill specific offense characteristic enhancement. Ms. Rydberg did not agree with that, and included the plus two in her calculation.

I am appreciative of the government, that the government in their sentencing memorandum, as this Court I'm sure has observed, is they do not believe that the special skill enhancement is appropriate. I obviously agree with that. So I don't think that the special skill enhancement should be included. If it is not included by virtue of the way the calculation and the acceptance works, it would be a total offense level of 10 rather than 11.

THE COURT: All right. And then 10 would be 6 to 12 months?

MR. FITZGERALD: Yes.

THE COURT: Okay. Very well. I'll accept the parties' agreement on that, not using that enhancement.

And with that, I'll turn to the prosecutor

first as to where you believe Mr. Spurlock should be sentenced. And I think that based upon the fact that the entity is involved you can address both of them at the same time.

MS. PERRIN: Okay. Thank you, Your Honor.

And I think, Your Honor, defense counsel made a point in his sentencing memorandum that -- I think the only point of disagreement between the parties at this point is whether a period of home detention is appropriate, or whether a brief probationary sentence is appropriate. So I think that's where I will, unless the Court disagrees, that's where I'll sort of focus on --

THE COURT: That's fine.

MS. PERRIN: -- on Mr. Spurlock himself.

The government is requesting a sentence of five years of probation for Mr. Spurlock, with four months to be served as home detention. Additionally, the fine is jointly recommended for$32,000 to be paid jointly and severally by the company, and Mr. Spurlock.

And then Mr. Spurlock has also agreed to replace the emissions controls on any of the vehicles that are within his control, to replace all the emissions controls and then put the vehicle back to stock.

THE COURT: Let me just ask you the one

question. It always confuses me as to home detention versus home incarceration. Because home detention I think he still gets to work, right?

MS. PERRIN: That's correct, Your Honor.

THE COURT: Okay. Just making sure.

MS. PERRIN: Yes.

THE COURT: All right.

MS. PERRIN: We actually had a case yesterday where we went through that distinction. I'm not sure that I was aware until yesterday.

THE COURT: Before when we were doing just the guidelines, it was more concrete of a distinction but it seems like more often you see it interchanged, and we just have to be specific with which one it is.

MS. PERRIN: Right. And I admit, Your Honor, I think we were not specific in the sentencing memo, but it is home detention.

THE COURT: Very well. Thank you.

MS. PERRIN: Thank you.

As the Court well knows, this matter is governed by the 3553 factors. I'll start, Your Honor, with the nature of the offense. The defendant here has pleaded guilty to the Clean Air Act violation of tampering with a monitoring device that is required to be maintained under the Clean Air Act. He engaged in

tuning and deleting vehicles for years, removing all of the emissions controls from vehicles, and tampering with the monitoring device on those vehicles.

It's important, Your Honor, I think to understand sort of the backdrop of the emissions requirements and why this case is significant, and others like it. Manufacturers are required to establish emissions standards on their vehicles as created by Congress and implemented by the EPA. And they can do that in any number of ways, they just need to make sure that they meet those emissions standards.

And the purpose of those is either to remove, or at least reduce, certain pollutants. And those tend to be nitrogen oxides, sulfur dioxides, particulate matter, unburnt hydrocarbons, and other hazardous air pollutants like lead and mercury. Within that emission control equipment, and there's a diagram, Your Honor, I think it's on page 5 of the government's sentencing memorandum, are these little censors that basically send information back to the vehicle's computer indicating whether there's a malfunction or whether the equipment has been removed.

So if, as happened at Matanuska Diesel for years, if that equipment is removed, a tune needs to be installed on the vehicle that basically tampers with the

vehicle's computer. Essentially tricking it into believing that all of the equipment is still present. If that were not occurring, the vehicle would eventually enter limp mode and would no longer function properly.

So the removal of the emission controls, Your Honor, that's what's typically referred to as a delete, and then the modification of the OBD, the tampering, that's generally referred to as the tune. And that's the crime, it's a tune. It's that modification, tampering with that on-board diagnostic system, which is a monitoring device that's required to be maintained under the Clean Air Act.

THE COURT: What's the benefit to the defendant to do that?

MS. PERRIN: For the defendant, it's money. He charges customers approximately $1,500.

THE COURT: What's the benefit to the customer?

MS. PERRIN: To the customer it's a number of things. Admittedly diesel vehicles can be difficult and expensive to maintain. And if they're not maintained properly and given the attention that they need, the particulate filter can get clogged up; the emissions control system might not work effectively. And admittedly it's expensive to replace that entire system, all of the emissions control systems once those -- if

they're not maintained properly.

Some individuals believe it increases gas mileage. Some individuals want kind of some extra towing power, extra torque on their vehicles. And then others, to be quite frank, kind of just like the idea of blowing black smoke out of their vehicles. But I think, at least with the earlier versions of these vehicles, as the equipment manufacturers were figuring out, you know, what works properly and what doesn't, there were more problems with the emissions control systems. In the more recent years there hasn't been as many problems, and the manufacturers have figured out a lot of issues along the way.

For EPA CID, we focused the criminal enforcement efforts on those vehicles that had -- that were fully deleted. Had all of their emissions control removed and then retuned to basically prevent the vehicle from shutting down. The impact however, Your Honor, for these when a vehicle is tuned and deleted, it is a dramatic increase in the amount of pollutants being emitted from those vehicles.

In this situation the defendant tampered with at least 20 vehicles. And in the government's sentencing memo in Exhibit 1, we've attached a toxicology memo from EPA's toxicologist, which describes

some --

(Whereupon, the Court Reporter interrupted for clarification.)

MS. PERRIN: I will take a breath. I will slow down. Apologies, I'm from New York, I have a lot of hand movements. I talk quickly.

So for each of those tuned vehicles, when they're tuned and deleted, they will emit approximately one additional ton of nitrogen oxides into the atmosphere for the life of their vehicle, and an additional 18 pounds of particulate matter. So for those 20 vehicles alone, that's an additional 20 tons of nitrogen oxides, and 360 pounds of particulate matter being emitted into the air, and particularly in the Mat-Su Valley, which is already suffering from some particulate matter and air issues in that area.

And that black soot that you may have seen, you know, at some point coming out of the vehicles -- a vehicle's exhaust, we've probably all seen at some point, contains a host of hazardous air pollutants and they can create both long- and short-term issues. Those are breathing issues, asthma, bronchitis, heart-related issues, and even cancer. And, in fact, there's a link between exposure to diesel particulates, often people who live along highways, and increased hospital visits,

absences from work and school, and even death.

And so these are not insufficient violations, Your Honor. In part that's because this is not a discrete pollution event. It's not something that has a clear start date and end date, as we often see in environmental criminal violations, or other violations. These vehicles will continue to pollute this community for years to come, having impact on any number of victims. And, you know, while there's no identified set of victims, basically anybody who interacts with these vehicles in any way, is going to be breathing in excess pollution.

THE COURT: If you know that he did this to 20 vehicles or so, don't you know which vehicles they are?

MS. PERRIN: It is a good question, Your Honor, and unfortunately it's one that comes up in every sentencing that I've had for these types of cases. We do. We do know which of those vehicles have been tampered with. Unfortunately there is nothing -- I shouldn't say there's nothing -- each state is different in how they implement emissions laws.

And California, for example, has very stringent emissions laws. There is nothing in Alaska state law that prevents this violation. This is a federal violation, obviously that's why we're here. EPA could

contact all of those individuals, and ask them to put their vehicles back to stock and return all the emissions controls. But unless we -- you know, have the people that implement -- or enforce the criminal aspect of laws, unless we brought criminal cases against each and every one of those individuals, there's not much that we can do to basically force them to comply with the law.

And I understand that is an unsatisfying answer to that question, but it's unfortunately one that we've lived with for as long as these cases have been enforced.

THE COURT: How does EPA find a case like this?

MS. PERRIN: How did they find?

THE COURT: Yeah. How did Mr. Spurlock and Matanuska come into their site?

MS. PERRIN: That is a good question. And I'm trying to remember, because sometimes they sort of bleed together.

I believe, Your Honor, it was something I was actually going to touch on, there were a number of cases that were -- similar cases that occurred within the District of Alaska that are in our sentencing memo. The first of which was a shop here in Anchorage called Arm Rippin' Toys. That search warrant was executed in I

believe it was September of 2020. I believe that we found out about that case from a tip from a nearby neighbor who was sort of frustrated about what he was seeing, it was a mechanic that worked at that shop. And when that business ultimately went out of business, Mr. Spurlock hired that same mechanic to work at his shop and to delete the vehicles. So I believe we had heard this through other individuals that that same mechanic was working at Mr. Spurlock's shop.

THE COURT: Okay.

MS. PERRIN: So with respect to similar defendants, Your Honor, these cases have been enforced since 2018, even though the law has been on the books since the early 1990s. And there is a compliance initiative that was started under the first Trump Administration, when EPA sort of recognized that the impact of this aftermarket defeat device issue was essentially undoing all of the technological and legal advances for vehicles, and turning back the clock on emissions. And this occurred after the VW scandal, and EPA's recognition that what was occurring with these aftermarket devices was far worse than what had occurred with the VW scandal.

So there's two sets of cases, Your Honor, that I think are most applicable. Obviously the defendants

for the Arm Pippin' Toys case, and then an additional defendant, Daniel Chase, who was the owner of DC 907.

But tellingly, Your Honor, EPA conducted a search warrant at DC 907's facility on the same day that they executed a search warrant at Mr. Spurlock's, both his residence and his shop. And at that point Mr. Chase, having heard about the Arm Rippin' Toys search warrant and their criminal convictions, he had largely stopped engaging in tunes and deletes, because he recognized that it was illegal and that it was criminal, and that EPA was looking at it as such. Alaska is a small community, the diesel community is even smaller and word had spread fast at that point.

But Mr. Spurlock obviously took a different choice. He continued to engage in tunes and deletes up until the day of that search warrant.

I'd like to address, just -- I should say, there was one other defendant who was just sentenced just yesterday, Mr. Christenson. He was the owner of another repair shop in the Mat-Su Valley, known as Elite Diesel. That case is not quite applicable because he had also submitted a false statement to EPA, but he received a sentence of six months home detention, in addition to, I believe it was a $110,000 fine.

But we believe Mr. Hanzuk, his sentence is

similar to Mr. Spurlock, but obviously made worse by the fact that this defendant, Mr. Spurlock, kept going after Arm Rippin' Toys and hired the Arm Rippin' Toys defendant.

I'd like to just briefly address this sort of cold weather issue that defendant has raised in the sentencing memorandum. And if you have questions about that, Your Honor, I can go into some of the details of it. But it's true that diesel vehicles don't work quite as well in cold weather as they do in warm weather, and there's any number of reasons for that. The equipment manufacturers know that, and they've put things in place to sort of address those issues.

There is a heater within the diesel exhaust fluid tank that kind of helps that diesel exhaust fluid warm up, and there's other things that manufacturers have put in place to kind of address this issue. But more importantly, defendant's argument really only addresses one component of that entire emissions control system, the SCR and the DEF tank. In Mr. Spurlock's work, he removed all of them. He removed the entire emissions control system and even -- there is a device within the engine that he blocked off as well and sometimes removed.

So the issue of the cold weather is really only

applicable for one of those issues -- one of those components, and the equipment manufacturers have kind of come up with ways to address that.

As the Court well knows, sentencing is a weighing of factors. And on the one side of the scale is a young individual without any criminal history, who's come in and admitted his guilt, and taken responsibility for his actions. But on the other side of the scale, Your Honor, are the actions of a defendant who intentionally removed pollution controls from customer vehicles and tampered with their monitoring devices for years. Knowing full well that it was not just illegal, but that it was a crime.

THE COURT: How many years?

MS. PERRIN: Your Honor, I believe it was 2020 to -- I can't remember if it was 2022 or 2023.

I apologize, Your Honor. I should know that off the top of my head.

I believe it was June 2023 that was when the search warrant was executed at his facility. And our understanding is that he stopped engaging in tunes and deletes at that time.

THE COURT: I think we -- July of --

MR. FITZGERALD: Judge, the factual basis in the plea agreement indicates July 2020 to June 2022.

MS. PERRIN: You are correct. My apologies.

THE COURT: Okay.

MS. PERRIN: And as I mentioned, Your Honor, defendant's actions will have long-lasting impacts to his community, potentially health impacts for that area, which again is already suffering from air pollution issues.

Because of all of these factors, Your Honor, we believe that the recommendation of five years probation, with four months served as home detention, is sufficient but no greater than necessary. And then again, that jointly recommended fine of $32,000, which we believe will sufficiently disgorge the defendant of the financial benefits that he received from committing these crimes.

THE COURT: Okay. Thank you very much.

MS. PERRIN: Thank you, Your Honor.

THE COURT: Can I hear from the defense, please?

MR. FITZGERALD: Thank you.

Judge, there is much that I agree with in the comments of my colleague. I do want to make it clear though, that with respect to the vehicles that came to my client's shop were in limp mode. And that created a very difficult situation for people who had paid a lot

of money for rigs to run in -- diesel rigs to run in Alaska.

THE COURT: What did you call them, they were in what mode?

MR. FITZGERALD: Limp mode. And that happens, and to some extent it is referred to in the article addressing a recent legislation by Senator Sullivan and Senator Lummis of Wyoming, is that when it goes into the limp mode, it essentially disables the vehicle. The vehicle will not operate -- well, it will operate, but you're limited to something like 5 or 10 miles an hour. It is functionally inoperable.

THE COURT: And what is supposed to happen then when you have that, if you were following the law and not removing the mechanism, you go in and have it altered, or what do you do? Does it need to be repaired? What happens?

MR. FITZGERALD: Well, at that particular time there was very little that you could do about it, other than replace the entire system and do a conversion, which is extraordinarily expensive particularly with regard to a new vehicle that costs tens of thousands of dollars to purchase in the first instance.

And with all due respect, the legislation that Senator Sullivan and Senator Lummis have just recently

promoted, this is in October or November of this year that this legislation has been introduced, demonstrates that the problem persists. The problem hasn't gone away. And what happened as a functional matter is for years this was kind of going on, and everybody in the business knew that it was going on.

As I indicated in the sentencing memorandum, these parts that were being used to render a vehicle capable of kind of overcoming the disabling by the emissions systems were advertised nationally as to address this very problem. There were manufacturers and distributors of these parts that advertised and distributed them with the idea that it would remedy this very problem by rendering the emissions systems essentially moot.

And that problem -- so the EPA -- and I'm criticizing -- it is illegal under federal law, as my colleague said, and that's the reason why we're here and not in state court.

But the problem is that the EPA then came in and started to enforce this, and as a result of that at some point then addressed the issue with the manufacturers, the big players, that were making money by selling these parts and advertising these parts. So they stopped and the problem still exists, which is why

the legislation has been recently promoted, is the problem still exists in cold weather climes [phonetic], as I reflected in the sentencing memorandum.

And so I think it important to distinguish that my client was certainly involved in these -- as he's pled to -- tuning and deleting. But it wasn't for the recreational purposes that are identified by the government, they have a cool truck that belches black smoke. These were customers that were coming to him with a very serious problem, which is typically a very expensive vehicle, that were rendered inoperable -- virtually inoperable by the emissions systems. And as I indicated the system -- the problems still persists.

We are here today really to address what I fronted in the sentencing memorandum, which is whether any home detention should be provided to or imposed against Mr. Spurlock. And even though, as again as my colleague acknowledged, that there has been kind of loose language with regard to home confinement. Home confinement is much different than home detention, and the agreement with regard to home detention.

Still with all of that, we're opposing imposition of any home detention. And that's where I'll start my main discussion. As was indicated in the pre-sentence report, Ms. Rydberg, even though she

determined there was a total offense level of 11, determined that not only a completely probated sentence was consistent with the guideline range, but more importantly, or more significantly, that it was wholly consistent with the 18 U.S.C. 3553(a) factors that this body has to consider.

Now, we know that that total offense level has been reduced from 11 to a 10 by agreement of the parties. And Ms. Rydberg clearly made a determination, even though she was coming from a different total offense level, an increased total offense level, that under the 18 U.S.C. 3553(a) factors, that a completely probated sentence, meaning no home detention, was completely appropriate with those factors and was consistent with the overriding principle that this Court has to consider in those factors, which is to impose a sentence that's no more than minimally necessary to achieve the sentencing goals.

And so the Government for its part and, again, I'm appreciative, indicated that the two points were not appropriate. Still they have recommended four months of home detention.

And I've listened with -- carefully with regard to the comments made by my colleague, because I was wondering whether they would essentially fill the gap of

what I consider to be a weakness in their argument, and she didn't. The argument is almost completely based on a comparative factor with regard to Alaska cases that have had similar charges.

And in my sentencing memorandum, I broke down that comparison in some detail to demonstrate that the comparison actually works in Mr. Spurlock 's favor. Not to the opposite. And so I mentioned in the sentencing memorandum, Daniel Chase, one of the cases that the government has relied on to distinguish Mr. Spurlock. And my position is when you compare the factors and the considerations in 907/Chase case, Mr. Spurlock is well entitled to no home detention.

In the Daniel Chase case he received a completely probated sentence of three years -- not the five that we're talking about here -- for tuning and deleting, not 20 vehicles, but 144 vehicles. Seven times the number that are involved here. Mr. Chase was also fined $50,000 for those 144 vehicles, which is but a fraction comparatively of the fine that has been imposed against Mr. Spurlock, and Mat Diesel of $32,000. And then when combined with the fine from the co-defendant, Mr. Trevors of an additional amount.

I also pointed out that the Brendan Trevors matter, Mr. Spurlock's co-defendant, also comparatively

demonstrates clearly and compels, in our view, the conclusion that no home detention should be imposed against Mr. Spurlock. And in that particular case, as I'm sure this Court is well aware, Mr. Trevors was involved in the very same conduct that we're talking about here. He was involved in the same length of period of time and the same activities, which give rise to the charge against Mr. Spurlock.

Mr. Trevors, in fact, was a co-owner for most of that period of time in Matanuska Diesel, and he was either a co-owner or employee during the entirety of the period between July 2020 and June 2022. And Mr. Trevors received, for the same conduct, he received a third of a fine, and received no home detention --

THE COURT: Half the fine, maybe? 16,000.

MR. FITZGERALD: Yes.

THE COURT: And he's got 32,000.

MR. FITZGERALD: That's right.

THE COURT: So not a third.

MR. FITZGERALD: You're correct.

THE COURT: That's okay.

MR. FITZGERALD: My math is a little wrong. Thank you for the correction.

But what is clear is that the -- what he received was a deferred prosecution.

THE COURT: Pretrial diversion, right.

MR. FITZGERALD: And so as a result of that what Mr. Trevors is going to end up with, assuming he's successful, with no conviction at all. And Mr. Spurlock, not only has a felony conviction that's he's saddled with, but also the government is recommending four months of home detention.

It doesn't -- it frankly doesn't square. And it doesn't square with regard to the factor that the Court -- that the prosecution emphasizes.

THE COURT: The unwarranted sentencing disparity?

MR. FITZGERALD: That's right. Treating similarly -- person similarly, which is another hallmark of any sentencing scheme.

But what was absent in my colleague's comments and what was considered by Ms. Rydberg when she recommended no home detention, is a consideration of the other factors under 18 U.S.C. 3553(a), which this body has to consider. And as I indicated in my sentencing memorandum, I agree with the comments that were made by Ms. Rydberg.

As an example, she addressed the history and characteristics of the defendant. She noted appropriately, he has no prior criminal history. He has

a stable residence in Wasilla, lives with his wife and infant daughter, has no prior substance abuse, or mental health issues. He's self-employed. Still self-employed with Mat Diesel, that has a variety of different employees, upon which the business depends -- or upon which they depend. He owns a home in Wasilla. He has prosocial support through his wife and his parents. And she recommended, based on that factor, a term of probation appears appropriate to address this factor.

She goes on to address the factor under 18(a), the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. And it indicates again, that no probation is necessary to address that factor. She also addresses deterrence, and says that no home detention is appropriate to address that. And she discusses some of the other factors, but I think appropriately says, some of the factors aren't really pertinent to that -- to deciding that particular issue.

But the point of all of this, Judge, is that the prosecution has relied on but really a single factor, which I think when you break it down, actually doesn't work in their favor. It works in Mr. Spurlock's favor comparatively that no home detention should be

provided here. But they haven't really addressed the other factors that the Court has. Ms. Rydberg has. I have, to that extent as well.

And in considering all of those factors, I agree wholeheartedly with the pre-sentence writer, that completely probated sentence is not only completely consistent with the guideline range, but -- at least how that guideline range works. But in addition to that, and most importantly to the 18 U.S.C. 3553(a) factors.

And here's the final point that I would say, that is that the overriding principle of all of this is you impose no more severe sentence than is absolutely minimally necessary to achieve the sentencing goals. And when doing that, home detention -- any period of home detention isn't necessary to achieve those goals. And the government hasn't argued to the contrary.

As a result of that, Judge, we would request that no home detention be imposed against Mr. Spurlock for all the reasons that I've articulated.

But I'm happy to answer whatever questions the Court might have.

THE COURT: I don't think I have any. Thank you very much.

Would you like to reply at all, Ms. Perrin?

MS. PERRIN: Your Honor, I would like to just

briefly address Mr. Trevors. And I apologize I neglected to mention that earlier. There are factors in Mr. Trevors' case that are not present here. But one of those is the fact that we did not have evidence that Mr. Trevors was engaged in the actual tuning and deleting of vehicles.

My understanding is that he provided more front-of-shop assistance, helping customers, but he's not a mechanic. He was not proficient in tuning, which involves computer systems. So he was not involved in the actual crime here. But he, you know, he aided in it obviously, by purchasing equipment and things like that. But we believe that he's different in that respect. And he also just -- he didn't benefit in the same way financially as Mr. Spurlock did, because he left, as an owner of the business, I believe halfway through this criminal conduct.

THE COURT: All right. Thank you for that.

All right. Mr. Spurlock, before I sentence you, you do have the right to address the Court. Do you want to say something?

THE DEFENDANT: Yes, Judge, I would.

It's not how like the courts are on TV. There's a lot of things that have been said. I disagree with a lot of them. Some of them are not factual. Not

a single person that's ever came to me, has ever came to me recreationally. They were business owners. They were people. They couldn't operate their business without their vehicle. They were on the fence of not being able to make mortgage payments, pay their employees, pay their taxes. They rely on these vehicles, and they don't know when they buy them from the dealership, $80-90,000 a vehicle, that they're like this. And when they come to you, and they tell me the dealership is three to six months out. Well, it's no different here. We can't get the parts. They are on back order. Nobody wants to address that problem.

The DEF does have heaters to unfreeze it, but when it's negative 20 out, there's censors that that exhaust has to hit to a certain temperature, and it never will. It will plug. And those are facts.

Also nobody wants to address the fact that these newer vehicles without the emissions have been tuned so cleanly that there's almost a fine line between them. Nobody wants to talk about that.

I don't view myself as a criminal. I never will. I don't think -- you know, I helped people. I never did it for recreationally. It's hard when people are at your front door going, well, what do I do? I can't afford to buy another vehicle. This vehicle is

going to be down for six months, how do I run my business? So I've loaned out personal vehicles to help people while they're waiting on parts for this stuff here recently on it.

All I was trying to do was help them. So, you know, none of this stuff about the tuning. There might be people out there and there are people out there that are doing this recreationally. We were not one of them and not one of those people were. Those people were needing help.

You know, basically the way I'm viewing it is I'm being given a life sentence with a felony. I won't be able to return back to the National Guard as I was asked to, as we have a shortage of employees there, because of my mechanic skill set I was asked to come back and train new people. I can't go do that. There's many things in life I will not be able to do now with my daughter because of this felony. To me this is one of -- the felony is one of the worst things. I don't care about the money. I don't care about any of that. That's the worst thing.

But in my point of view, yeah, I'm accepting responsibility for doing it. I do not view myself as a criminal and I never will. I tried to help these people. And in fact that -- I've been called in to, you

know, senators offices and talked about it with several other diesel shops. We've been called in as groups. We've given them the facts, given them the data on all this stuff, and they go, yeah, this is a problem. When I was working on the slope, I didn't even know any of this was illegal. I just thought it was common practice, because I was watching huge oil companies delete this stuff off of their trucks.

And here recently -- we do work for the Alaska Railroad. They've gone all to gas vehicles, because they can not afford to keep their vehicles on the road. They keep going into limp mode on the railroad tracks. It's very expensive to get them towed off of the railroad tracks. So they're not even using diesels. They're going to gas vehicles.

Which by the way run at 50 efficiency compared to a diesel, even a deleted one. So every gas vehicle has more pollutants than a diesel does, based on efficiency of that engine. So that's something to keep in mind on it. I think that there's a lot of aspects to this cold weather that aren't taken. This is a totally different place to live, totally different place to operate a business.

I've been all over this state. I've been out to the villages, I've done work. I've been up north,

I've done work. This is not the same as the Lower 48, and this is certainly not California. These people are not doing it recreationally. And I still have watched companies so desperate to do it, you know, that they are -- they will drive to Canada if they have to. But, you know, nobody tells them when they buy these vehicles that this stuff is such a problem on them.

That's really all I have to say. And I appreciate everyone's time and effort in the thing. But that is my point of view, so whatever sentence is placed upon me, I understand, but that's where I stand.

THE COURT: Thank you.

THE DEFENDANT: Thank you.

PROBATION OFFICER: Your Honor, may I ask a question and just clarify the guideline range, Your Honor?

THE COURT: The what?

PROBATION OFFICER: The guideline calculation?

THE COURT: It was a Level 10, criminal history Category I, 6 to 12 months.

PROBATION OFFICER: So when I removed the two levels for the special skills, Your Honor, that went down to a 14 for the adjusted offense level, and I had given Mr. Spurlock the minus two, for zero point offender so that would be --

Oh, I see what you mean. Okay. So it was only acceptance of two then?

THE COURT: He only gets two then for the acceptance as opposed to the three.

PROBATION OFFICER: Okay. I just wanted to clarify, Your Honor.

THE COURT: Right. I know. Once you get below that one level, so it goes down one level.

PROBATION OFFICER: All right.

THE COURT: He loses the third point, because it's just two for acceptance, but thank you for clarifying.

PROBATION OFFICER: Thank you.

THE COURT: Okay. And that is the beginning of our sentencing hearing, which is that your guideline range is 6 to 12 months. Okay. So we start with the seriousness of the offense. Fascinating educational process for me, not knowing very much about any of this, and I was very intrigued by the whole system.

Clearly Congress set forth some regulations in order to protect the public, and their thinking when they did this was to protect the public from pollutants in the air. Certainly those people who live up here in this beautiful state recognize how wonderful and fresh the air generally is compared to many places in the

Lower 48. So one would think that that would just be a simple solution, but weighing it with all of the other factors that you've just mentioned.

I can see that your motivation certainly was not ill motivated. It wasn't like I was going to go out there to break the law. I wasn't going to go out and harm the air. So much as it was that I was going to go out there to try to help people continue their businesses. I find that to make the overall harm and seriousness of the offense less serious. And I rarely ever say that. I rarely say that the offense is less serious. But I can see a very unique setting here that makes it less serious under the circumstances.

But it's still, as you have done, it's the law. Congress set it, you broke it, and whatever the motivations you've accepted that responsibility, and you've said that.

As far as recidivism, you're not going to recidivate. You've got -- you have no criminal history. The history and characteristics of you, you have a family, you have a business, you have a community to support. So I have no concern that you are out there to commit another crime.

General deterrence. You're taking it. You're taking a felony hit for violating this law, and people

who will see that, will see that is the risk if they follow through with doing something like this.

The disparity of the sentencing, I agree with the defense here that Mr. Trevors who got a pretrial diversion and 18 months, who was a co-owner during the same period of time, that does not sit well with me that he is in a dissimilar position. And Mr. Chase, who had 144 vehicles certainly did much, much more than the what the defendant here did with his three -- what was it, he got three years of probation and $50,000 fine. So I do not believe that any home confinement is necessary in this situation. I think the disparity in sentencing would show that that is the case.

I also think that there's no health or medical conditions that I need to address with you. So as far as your probationary period, you've all agreed that five years is the appropriate period of probation with $32,000 fine, and I'll accept that. Going forward, you also have a $100 special assessment.

But as you move forward, you have to recognize that when Congress comes out and enacts these laws, they're there. Sometimes we disagree with them, but they're there.

I also think it's going to be a harsh thing to have a felony conviction for someone with no criminal

history. And who has not violated the law in what would be a really egregious way, but has done so with the motivation to help his community. So, you know, it's not like there's duress. It's not like there's justification. None of those legal defenses apply to you, and I think you recognize that. I think you recognized that, and you accepted responsibility for that. But that's going to be a harsh component to your moving forward in life is that you're going to have a felony conviction. And that's another reason why I don't think home confinement is essential or necessary, and it would be overly harsh in this setting.

But I do have to go through the different conditions of your supervision. I will give the entity three years of probation. The entity will get a joint and several fine of the $32,000. And there's a special assessment on the entity of $400. So that is just -- there's a separate sentence there.

But let me go through the mandatory conditions for you. You must not commit another federal, state, or local crime. You must not unlawfully possess a controlled substance. You're one of the few defendants I have sentenced up here in the few years I've been doing this that has absolutely no history of using controlled substance, which is very admirable and can

stay on that path.

You must refrain from any unlawful use of a controlled substance and submit to -- oh, I don't think he needs the drug testing -- and you checked that?

PROBATION OFFICER: I did, Your Honor.

THE COURT: It's suspended.

PROBATION OFFICER: Yes.

THE COURT: I don't think he needs that.

All right. You need to cooperate in the collection of a DNA sample as directed by probation. You need to report to your probation office in the federal judicial district where you are authorized to reside within 72 hours. That's here in Alaska. And then follow the directions of the probation officer as how to continue to report.

You can't leave the federal judicial district without first getting permission from the Court or probation. So all you do is you ask, you know, I'm going to visit my parents in Ohio, may I have permission, that type of thing.

You must answer truthfully the questions by your probation officer. You have to live in a place that the probation officer approves. I'm sure living with your wife and child right now is an approved place. You just notify probation ten days before changing your

residence. If for some reason you cannot do that for some unanticipated reason, then you need to notify them within 72 hours of the change.

You must allow the probation officer to visit you, and that will be a condition for both the entity and you. And permit the probation officer to take any items that would be a violation of your supervision or that he or she views in plain view. You must work full time, 30 hours a week at lawful employment, unless you get permission, that's from the probation officer. And if you do change your position or your work, make sure you notify probation within ten days again. Again, if you can't do that within ten days, it's within 72 hours of the change.

You shall not communicate or interact with anyone you know is engaged in criminal activity. And if you know someone who's been convicted of a felony, you shouldn't communicate with that person without first telling probation and making sure they say it's okay for you to communicate with that person.

If you are arrested or questioned by law enforcement, you should notify probation within 72 hours. You shall not possess a firearm and ammunition or destructive device or dangerous weapon. And that is anything that's designed or modified for the

purpose of causing body injury or death to another person. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or an informant unless you get permission from the Court. And if you are a risk to another person or organization, the probation officer may require you to notify that person about the risk. And they may contact the person to make sure that you did so. You just need to follow the instructions of the probation officer during probation.

And then you will have to submit to a warrantless search of your person, your vehicle, or your property. This search is only if probation has suspicion of contraband, or of a violation of a condition of supervision. But since it can result in revocation if you refuse to submit to it, you should tell the people that you live with that this is a condition of your probation.

You pay any fine or restitution in accordance with the Court orders. And during the term of supervision you shall apply for the Alaska Permanent Fund dividend and apply a hundred percent of it toward any outstanding fines that are owed in the case.

The organization shall notify the Court or the probation upon learning of any material adverse change

in its business or financial conditions, or the commencement of any bankruptcy, civil litigation, criminal prosecution, or administrative proceedings. This is for your company. So, for example, if you're going to go into bankruptcy or something, you need to notify probation. And the company needs to make the same payments on the fines that I've imposed.

You agree you will also return any tampered vehicles that you have in your possession or control back to emissions compliance those vehicles. And this shall include replacing the required emissions controls as detailed on the vehicle emissions control information label on each vehicle owned by you or Matanuska Diesel. And returning the on-board diagnostic systems to the original parameters.

You shall not commit any further violations of the Clean Air Act, including falsifying, tampering with, or rendering inaccurate the OBD of any vehicle.

That is the conditions. Are there any that I've missed from probation?

PROBATION OFFICER: No, Your Honor.

THE COURT: Okay. Any from the prosecutor?

MS. PERRIN: No, Your Honor.

THE COURT: All right. Anything from you?

MR. FITZGERALD: No, Judge.

THE COURT: Okay. So that will be the imposition of my sentence.

And did he waive his right to appeal?

MS. PERRIN: He did, Your Honor.

THE COURT: Okay. So I won't give you any appellant rights then. All right. So I wish you well going forward.

MS. PERRIN: Your Honor, I do need to dismiss the additional counts in the indictment.

THE COURT: Yes, please.

MS. PERRIN: The government moves to dismiss for Mr. Spurlock Count 1 and then 3 through 10.

THE COURT: Okay.

MS. PERRIN: And for Matanuska Diesel, the government moves to dismiss Counts 2 through 10.

THE COURT: Got it. Okay. We will do that now. Thank you.

All right. Thank you everyone. Have a good day.

DEPUTY CLERK: All rise. This matter is now adjourned. This Court now stands adjourned subject to call.

(Whereupon, the Court adjourned at 11:24 a.m.)

--oo0oo--

--o0o--

CERTIFICATE

I, Stacy M. Baldwin, Federal Official Court Reporter in and for the United States District Court of the District of Alaska, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated May 1, 2026.

/s/ Stacy M. Baldwin
STACY M. BALDWIN, RCR, RMR
FEDERAL OFFICIAL COURT REPORTER